**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Eddie Lee HAMMOND,**
**Defendant-Appellant.**

**No. 80–1762X.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Nov. 3, 1981.

Decided Jan. 28, 1982.

Rehearing and Rehearing En Banc
Denied March 18, 1982.

---

David E. Frank, Beverly Hills, Cal., for defendant-appellant.

Daniel G. Clement, Asst. U. S. Atty., Los Angeles, Cal., for plaintiff-appellee.

Before CHOY and NELSON, Circuit Judges, and INGRAM,* District Judge.

NELSON, Circuit Judge:

Hammond appeals his conviction on a charge of bank robbery under 18 U.S.C. § 2113(a). He contends that the testimony of a pretrial services officer (PSO) was admitted in violation of 18 U.S.C. § 3154(1), which requires that information acquired by PSOs in the course of their duties be kept confidential. He also asserts that the trial court erred in failing to suppress his confession and the identification testimony of two witnesses as fruits of both an unlawful arrest and an unconstitutional show-up identification procedure. Finally, he maintains that, confidentiality considerations aside, the PSO's references to Hammond's criminal record denied his right to a fair trial. We affirm.

FACTS

A. The Arrest and Show-up

A black male with a limp robbed the Citizens Savings and Loan Association of Harbor City, California, on August 14, 1980. A week later a woman entered the bank and told one of the tellers, Emelita Agacoilia, that two suspicious black males had just approached her in the parking lot at the rear of the bank. Agacoilia looked out the window in the direction of the parking lot and saw a "black male limping on the sidewalk." Agacoilia then told her supervisor that the man she had just seen "looked like the same person that robbed [the bank] the week before." Her supervisor telephoned this information to the police.

When the police arrived ten to fifteen minutes later, Hammond was the only person near the rear of the bank, and was seated in the only car parked there. The officers ordered Hammond to get out and place his hands on the back of the car. Hammond obeyed, and as he did so the officers noticed that he walked with a limp. Deputy Miller then conducted a pat-down search that yielded no weapons. During the pat-down search, Deputy Spaulding noticed a ski mask in plain view on the left front floorboard of Hammond's car. The officers placed Hammond under arrest.

The officers then took Hammond to the front of the bank in order to conduct a one-man identification. Hammond remained outside the bank, while the identifying witnesses stayed inside, protected from view by the bank's reflective windows. The witnesses stood some 25 to 40 feet from Hammond.

The officers asked Emalyn Buenviaje and Lorna Fronda, two tellers who had witnessed the robbery, whether "this is the man who had robbed the bank the week before." The tellers, having observed Hammond for three to five minutes, stated that he was.

Hammond was then taken to the police station, where he confessed to having robbed the bank. At trial, the Government introduced the confession as well as in-court identifications by Buenviaje and Fronda and testimony concerning their out-of-court identifications.

B. Trial Testimony of PSO

Hammond's main defense at trial was that, because he wears an artificial leg, he is unable to walk without the aid of a cane or crutches. The bank robber, although having a severe limp, had been able to walk unassisted. In order to buttress its case, the Government called Michael Morgan, a PSO. Morgan testified that he had seen Hammond walk unaided in the "lockup" area at the pretrial services office three years earlier. Morgan also made reference

---

* Honorable William A. Ingram, United States District Judge for the Northern District of California, sitting by designation.

to the fact that Hammond had had a probation officer at some time in the past.

Hammond objected to the reference to his probation officer; the trial court sustained the objection and immediately admonished the jury to disregard the remark. Later, Hammond moved for a mistrial, and then for a new trial, asserting that Morgan's testimony had been admitted in violation of the confidentiality provisions governing the conduct of PSOs. 18 U.S.C. § 3154(1). The trial court denied both motions.

## C. Independent Evidence of Guilt

Before demanding money from the tellers, the bank robber pretended to be an ordinary customer. During this time, Fronda asked him to list several items of information on a slip of paper. The robber wrote out and handed to Fronda a note containing a name, address, phone number, and social security number. The Government introduced into evidence a photocopy of this note.

A handwriting expert, called by the Government, testified that his comparison of Hammond's handwriting exemplars and the bank robber's note indicated that the note had "in all probability" been written by Hammond. He stated that if the original note was not a "tracing" of another writing, he would be certain that the handwriting on the photocopy was Hammond's. Earlier in the trial, Fronda testified that she had watched the robber write the note, and that he had not traced it from another writing.

The social security number written on the bank robber's note was 544–16–1346. Hammond testified that his social security number is 547–86–1347. Comparing these two social security numbers, it appears that the two are identical except that one digit in each of the three groupings is different.

imposed on PSOs by 18 U.S.C. § 3154(1). The statute was enacted in 1975 as part of the Speedy Trial Act, which, in addition to establishing guidelines for timely prosecution of criminal cases, created the Pretrial Services Agency to aid the federal courts in making bail determinations. The Act established the Agency on a trial basis, its operations to be confined initially to ten demonstration districts across the country. Because PSOs were to interview defendants before trial, Congress included in the Act a requirement that information obtained by the Agency "shall be used only for the purpose of a bail determination and shall otherwise be confidential. . . . In no case shall such information be admissible on the issue of guilt in any judicial proceeding[.]"

No court has yet issued an opinion defining the scope of the category of "information" that is subject to this confidentiality requirement. The legislative history of the Act does not address the question. It is thus unclear whether a PSO's observations may ever, as Hammond urges, fall within the ambit of the statute's protection, or whether the protection is limited to information that a defendant directly communicates to the PSO. On the facts of this case, however, we see no need to decide whether a PSO's observations may in some cases be confidential. Although the record is less than clear on the point, Hammond has failed to demonstrate that Morgan's observations were the result of any official relationship between the two men. Morgan testified that he had observed Hammond walking in the lockup area. Anyone who had been in the lockup area could equally have seen Hammond walking without a cane or crutches. Because Morgan's chance observations appear to have been unrelated to his official position as a PSO, we hold that they were properly admitted into evidence.

## I

### Testimony of PSO Concerning Hammond's Ability to Walk

■ We are called upon in this case to construe the confidentiality requirement

## II

### Suppression of Confession and Identification Testimony

Hammond also contends that his confession and the identification testimony of

those Government witnesses who observed the show-up should be suppressed. He argues: (1) that this evidence was the fruit of an arrest for which there was no probable cause; and (2) that the evidence was the product of an unconstitutional show-up identification. We disagree.

A. Probable Cause

Hammond asserts that the officers who arrested him knew only that two suspicious black males had been reported to be in the area, one of them walking with a limp. As the Government points out, this account distorts the facts considerably.

■ Part of the distortion is traceable to Hammond's unstated premise that the arrest occurred at the time the officers first ordered him out of the car. Hammond has adduced no evidence, however, to show that the initial confrontation between him and the officers was anything more than a limited *Terry* stop. *See Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). In *Dunaway v. New York*, 442 U.S. 200, 210–211, 99 S.Ct. 2248, 2255–56, 60 L.Ed.2d 824 (1979), the Supreme Court noted in dictum that brief investigative stops lasting for a minute or so do not necessarily constitute arrests. Consistent with this principle, the Government properly maintains that Hammond was not under arrest until after he had gone to the rear of the car.

■ Thus, in determining whether the officers had probable cause, this court must consider those facts that the officers learned between the time that they ordered Hammond out of the car and the time, apparently a few seconds thereafter, when they arrested him outside the rear of the car. The officers arrested Hammond on the basis of the following information: (1) their knowledge that Hammond walked with a limp, coupled with the knowledge that the bank robber had had a limp; (2) Hammond's possession of a ski mask on the floorboard of his car on an August day;[1] and (3) a police radio report that two per-

sons had been seen in front of the bank, one having a severe limp and possibly being the robbery suspect.

The police radio report, which Hammond's analysis ignores, was the primary basis for the officers' belief that Hammond was the bank robber. The report was based on information provided by bank teller Agacoilia. There is no real question that Hammond is the person that Agacoilia had seen standing outside the bank.

■ Where the source of police information about a suspect is an eyewitness to the crime, probable cause to arrest the suspect may exist even in the absence of an independent showing of the reliability of the source. *United States v. Mahler*, 442 F.2d 1172, 1174–75 (9th Cir.), *cert. denied*, 404 U.S. 993, 92 S.Ct. 541, 30 L.Ed.2d 545 (1971). This principle presumes, however, that the witness is fairly certain of the identification. Where the witness is less certain, as here, a case-by-case determination is required.

Admittedly, this is a close case. Agacoilia was less than certain that the man standing outside was the culprit. Nevertheless, we believe that her report, when combined with the officers' own observations of Hammond's limp and of the ski mask, constituted probable cause to arrest.

B. The Show-up

■ Under *Manson v. Brathwaite*, 432 U.S. 98, 114, 97 S.Ct. 2243, 2253, 53 L.Ed.2d 140 (1977), "reliability is the linchpin in determining the admissibility of identification testimony . . . ." Thus, even where a pretrial identification procedure is unnecessarily suggestive, the out-of-court identification may be admitted into evidence if sufficient assurances of its reliability are available. *Id.* at 114–17, 97 S.Ct. at 2253–54. The admissibility of subsequent in-court identifications is evaluated according to the same principle.

---

1. Although the Government introduced no evidence at trial that the robber had worn a ski mask during the crime, the presence of the mask may reasonably have formed part of the officer's basis for arresting Hammond.

■ The reliability of the witness' identifications must be determined, under *Manson*, in light of five factors: (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness' degree of attention; (3) the accuracy of the witness' prior description of the criminal; (4) the level of certainty demonstrated by the witness at the confrontation; and (5) the length of time between the crime and the confrontation. *Id.* at 114–16, 97 S.Ct. at 2253–54.

■ Two of the three bank tellers who testified, Buenviaje and Fronda, had viewed the show-up. We hold that both of their identifications were reliable under the *Manson* criteria. The strongest indicia of reliability for both identifications were the women's opportunity to observe the criminal at the time of the crime and their degree of attention. The robber had been in the bank for at least several minutes, left, and then returned between five and fifteen minutes later. While in the bank, he looked around as though he were trying to determine how many employees were on duty, and generally acted in such a suspicious manner as to prompt Buenviaje to activate the bank's surveillance cameras. Both Fronda and Buenviaje had an opportunity to observe the robber from a distance of only a few feet.

■ Although there is very little evidence that these women had provided prior descriptions of the robber,[2] this fact does not preclude a determination of reliability. *United States v. Williams*, 626 F.2d 697 (9th Cir. 1980). Further, the lapse of a week is not long enough to indicate clear unreliability. *See, e.g., United States v. Williams*, 596 F.2d 44, 49 (2d Cir.), *cert. denied*, 442 U.S. 946, 99 S.Ct. 2893, 61 L.Ed.2d 317 (1979). Finally, although Fronda's level of certainty of identification was lower than Buenviaje's,[3] both were sufficiently high to provide reasonable assurances of reliability. The admission of the identification testimony of both witnesses, as well as of Hammond's confession, was therefore proper.

## III

### Testimony of PSO Concerning Hammond's Criminal Record

[11] Hammond asserts that he was seriously prejudiced by Morgan's testimony revealing that he had had a probation officer and had been in the "lockup" area some three years before. He contends that this testimony brought to the jury's attention his prior contact with the criminal justice system, in contravention of the trial court's earlier ruling excluding all evidence of his prior felony conviction.

Although the parties have treated this contention as part of the broader question whether Morgan's testimony should have been entirely precluded on confidentiality grounds, we treat it separately. We do so because any prejudice that might have resulted from the jury's exposure to Morgan's remarks would equally have resulted if the comments had been made by a private citizen; and indeed, in light of our holding in section I, Morgan was acting as no more than a private citizen.

Because the trial court immediately admonished the jury to disregard Morgan's remarks about Hammond's probation officer, we find that any error due to this statement was harmless. This Circuit has held such a curative instruction to be sufficient even where the witness makes explicit reference to the defendant's prior felony conviction. *United States v. Belperio*, 452 F.2d 389, 391 (9th Cir. 1971).

■ Morgan's reference to Hammond's presence three years before in the lockup area was also harmless error. Given the

---

2. The Government points to the descriptions given by the witnesses *at trial* in an attempt to bolster its reliability argument. Because these descriptions may have been based on the witnesses' observations of Hammond at the show-up, rather than on their observations of the robber, they are clearly irrelevant to a determination of the reliability of the identifications.

3. Buenviaje testified at trial that she had positively identified Hammond at the showup. Fronda stated, "I think I thought I knew that was the man that robbed us."

testimony of the handwriting expert, the similarities between the social security numbers, the eyewitness identifications and Hammond's confession, it cannot be said that it is "more probable than not" that this nonconstitutional error "materially affected the verdict." *See United States v. Valle-Valdez*, 554 F.2d 911, 916 (9th Cir. 1977).

AFFIRMED.